UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
WINTER-WOLFF INTERNATIONAL, INC.,

                Plaintiff,

      -against-

ALCAN PACKAGING FOOD AND
TOBACCO INC.,

                Defendant.
------------------------------------------------------------X

**MEMORANDUM & ORDER**
**05 CV 2718 (DRH)(ETB)**

**APPEARANCES:**

**Epstein and Weil**
Attorneys for Plaintiff
225 Broadway, Suite 1203
New York, New York 10007
By:    Judith H. Weil

**Linklaters LLP**
Attorneys for Defendant
1345 Avenue of the Americas
New York, New York 10105
By:    Amanda J. Gallagher
       Robert H. Bell
       Joshua D. Burns

**HURLEY, Senior District Judge:**

      Winter-Wolff International, Inc. ("Winter-Wolff" or "plaintiff") commenced this action

in Nassau County Supreme Court. Defendant later removed the case to this Court, citing

diversity as the basis for federal jurisdiction.[1] Plaintiff's second amended complaint ("SAC"),

filed after removal, brings breach of contract and other related claims against defendant Alcan

---

[1] Plaintiff is a New York corporation with its principal place of business in Jericho, New York, and defendant is a Delaware corporation with its principal place of business in Chicago, Illinois. (SAC ¶¶ 1-2.)

1

Packaging Food and Tobacco, Inc. ("APF&T" or "defendant"). Before the Court are the parties'

cross motions for summary judgment pursuant to Fed. R. Civ. P. 56. For the reasons set forth

below, defendant's motion is granted and plaintiff's motion is denied.


# BACKGROUND

## I.    The Agreement

In July of 2002, defendant's corporate predecessor, Lawson Mardon USA Inc. ("Lawson

Mardon" or "LM")[2] entered into a "Manufacturer's Representative Agreement" ("Contract" or

"Agreement") with plaintiff. (The Parties' Local Civil Rule 56.1 Statement of Undisputed

Material Facts ("56.1 Stmnt.") ¶¶ 5-6.)[3] Under this Agreement, Winter-Wolff became APF&T's

exclusive sales agent for certain "Authorized Products," defined in the Agreement as "Lawson

Mardon flexible lamination food packaging products for retort applications." (Agreement at 16,

attached to the Declaration of Amanda Gallagher ("Gallagher Decl.") as Exhibit 1.) All

purchases of Authorized Products by "Authorized Customers"[4] within the "Authorized

Territory" of North America during the contract period would earn Winter-Wolff five percent

commissions on the net sales.

---

[2] Lawson Mardon USA Inc. later adopted the name Alcan Packaging Food & Tobacco. (D's Ex. 40.) Defendant does not dispute that it is subject to the Agreement as the successor to Lawson Mardon. (56.1 Stmnt. ¶ 1.) The Court interchangeably refers to Lawson Mardon and APF&T throughout this opinion where necessary.

[3] Successive versions of the 56.1 Statement passed between the parties in the process of prosecuting their respective motions. In citing to this statement, the Court refers to the final version filed by plaintiff. (*See* Docket No. 93, attachment 2.) All facts are undisputed, unless otherwise stated.

[4] The Authorized Customers are listed in Attachment A to the Agreement. (Agreement at 15.)

The broad aim of the Agreement was to "develop and maintain a substantial volume of sales for LM," in line with its objective to become a "major supplier in the US retort market." (Agreement § 1.) Specifically, the Contract called for Winter-Wolff to "actively support and effect the transition of product manufacturing activities [then] conducted by affiliates of LM in Switzerland and Germany to the United States," and to "use its best efforts to assist in LM's development of retort market in the United States." (*Id.* § 8(f); *see* Stacey Dep. 61.)

Before it could offer a sales price to a potential customer, Winter-Wolff was first required to seek authorization for a particular price quote from defendant. (Agreement § 2(g).) However, Winter-Wolff did not need to secure the sale itself in order to receive commissions. The Agreement specifically states that its provisions "shall not preclude LM, or an affiliate of LM, from directly or indirectly promoting or offering for sale any of the Authorized Products," so long as Winter-Wolff receives commissions on those sales. (Agreement § 2(d).)

Winter-Wolff believed that developing the domestic market for defendant could potentially take years with little immediate payoff, and therefore negotiated for a long contract period in which they would serve as defendant's exclusive sales representative. (*See* 56.1 Stmnt. ¶ 81; Stacey Dep. 86.) The agreed-upon Contract ran from January 1, 2003 through December 31, 2005, and under the terms of the Agreement, the parties could only terminate during that period for cause. At the end of the contract period, either party could terminate without cause, but only upon twelve months' notice. (*Id.* §§ 3, 6.) Therefore, unless the Agreement was terminated for cause, the parties' contractual obligations ran, at a minimum, through December 31, 2006.

## II.    The  Acquisition and Integration of PPPI

In late 2003 or early 2004, defendant's "indirect corporate parent," Alcan Inc., acquired the company Pechiney S.A., which owned and operated Pechiney Plastic Packaging Inc. ("PPPI"). (56.1 Stmnt. ¶¶ 7-8.) Prior to this acquisition, PPPI was a direct competitor to APF&T, with a foothold in the very same domestic market for flexible packaging that APF&T was attempting to develop through its representative Agreement with Winter-Wolff.  In fact, PPPI sold flexible lamination food packaging to some of the same Authorized Customers targeted in the Agreement. (*Id.* ¶¶ 14, 16.)

Although PPPI and APF&T remained separate corporate and legal entities following the acquisition, (*id.* ¶ 9), the two affiliated companies integrated their businesses in significant ways. For example, both conducted business under the trade name "Alcan Packaging," (*id.* ¶¶ 26-28); Alcan Inc.'s business unit, Alcan Food Packaging Americas, began to oversee sales for both of the subsidiaries, (*id.* ¶¶ 30, 61; Mosesian Dep. 48); both companies utilized the same sales website, (*id.* ¶¶ 49-50); and members of the two sales teams—although nominally employed by either APF&T or PPPI—identified themselves to customers as representatives of "Alcan Packaging," (*id.* ¶ 51), and used "alcon.com" email addresses (*id.* ¶ 53).   In a February 5, 2004 letter to the sales team of the "'new' Alcan Packaging," David Stacey ("Stacey"), APF&T's Vice President of Sales, stated that through the "integration process," the sales team would "be able to offer [] customers the widest range of product capabilities in the flexible packaging business" from a company "made up of many different parts, the latest of which is [PPPI]." (P's Ex. 5.) Additionally, Robert Mosesian ("Mosesian") served as Vice President and Chief Financial Officer of PPPI as well as Vice President and Treasurer of APF&T. (56.1 Stmnt. ¶ 58).  All decisions regarding capital investments at the two companies' respective factories were made by

one person, Michael Schmidt, a PPPI employee. (*Id.* ¶¶ 54-56.)  After the acquisition, Winter-Wolff's contacts within the company also changed.  Now, instead of going through David Stacey, plaintiff reported to Jeff Heaslip, a PPPI employee. (*Id.* ¶¶ 33-39.)  Plaintiff was also instructed to obtain authorization for price quotes from Erin Larson, also a PPPI employee. (*Id.* ¶¶ 26-28.)

In other key ways, however, the two companies preserved their status as distinct entities. Mosesian testified that they maintained separate corporate and tax identities, which meant keeping their own income statements, bank accounts, balance sheets and boards of directors. (Mosesian Dep. 28, 122, 141.)  Importantly, the two companies continued to maintain separate ownership of their preexisting production plants, with APF&T holding onto its plant in Shelbyville, Kentucky and PPPI to its plant in Neenah, Wisconsin.

The new "Alcan Packaging" joint sales team, which consisted of sales agents employed by either APF&T or PPPI, was now able to sell products produced at either factory.  As the companies' two plants had differing production capabilities, this meant that the sales agents could now offer their customers a broader range of products. (Lozen Dep. 121, 135.)  However, when approaching a customer regarding such sales, agents would not distinguish between products that would ultimately be produced by APF&T in Shelbyville or PPPI in Neenah.  As Stacey noted after the acquisition, "[t]here is only one Alcan and both Alcan and our customers have full expectations that we will integrate and operate as such." (56.1 Stmnt.¶ 48.)  The shared sales website did not make such a distinction either, branding all products as available through "Alcan Packaging." (*Id.* ¶¶ 49-50.)

It was only after a particular sale was made that the companies would decide which of the two factories would produce the order.  This decision would be based on "which plant had the

best production equipment," which plant had the most "experience in producing the product," which had the available capacity, and which plant "was qualified to produce the product." (*Id.* ¶¶ 64-66.)  Once a particular plant was selected, price quotes would be generated by that production plant. (D's Ex. 10.) And, upon shipment of the final product, the company that owns the plant where the items were produced would issue the payment invoice. (D's Ex. 11.)  The customer would then tender payment to whichever company owned the plant where the product was made – either APF&T or PPPI, (*see* Mosesian Dep. at 57).[5]

## III.    Termination of the Agreement

The acquisition and integration of PPPI naturally created certain redundancies within the two companies.  Many of the customers that had been "targeted by APF&T" prior to the acquisition were "preexisting within PPPI." (*See* Email dated 10/14/01, P's Ex. 7; Stacey Dep. 145.)  This overlap meant that various accounts that Winter-Wolff was charged with soliciting under the Agreement were also being approached by PPPI sales representatives, creating an unnecessary expense and sowing confusion among the customers. (*Id.*) Additionally, the two manufacturing facilities at issue—APF&T's plant in Shelbyville and PPPI's plant in Neenah— each possessed production capabilities that the other did not have.  As Stacey testified at deposition, "I think a business decision was made. If Shelbyville couldn't manufacture the product at that time, there was no point spending money, further money . . .  if the business was already being produced within PPPI." (Stacey Dep. 133.)    For example, after the acquisition, APF&T delayed the process of upgrading its Shelbyville plant to produce Meals Ready to Eat

---

[5] Some aspects of this assertion are in dispute, and are addressed later in the opinion at page 17.

("MRE") packaging because such products were already able to be produced at PPPI's Neenah plant. (56.1 Stmnt. ¶ 88.)

In March of 2004, Stacey met with the principal of Winter-Wolff, Dan Weil ("Weil"), for preliminary discussions about removing some of the Authorized Customers listed in the Contract. (56.1 Stmnt. ¶ 86.) Later, on July 14, 2004, Stacey sent a letter to Weil informing him that APF&T was terminating the Agreement, effective July 19, 2005. (7/14/04 Letter, D's Ex. 15.) The letter stated that APF&T would continue to pay the relevant sales commissions during this notice period on business that Alcan sales representatives secured themselves, but that Winter-Wolff was "prohibited from, directly or indirectly, contacting or engaging any of the [Authorized Customers]." (*Id.*)

Winter-Wolff responded by letter dated August 18, 2004, stating that defendant's notice of termination was a "nullity" because under the Agreement, neither party could declare its intention to terminate the contract, without cause, before the contract ended on December 31, 2005. (P's Ex. 16.) The letter also stated that APF&T had an implied duty under the Agreement to entertain all price-quote requests submitted by Winter-Wolff and that there was nothing in the contract authorizing APF&T to bar Winter-Wolff from contacting the Authorized Customers. The letter further noted that Winter-Wolff did not believe it had been receiving all of the commissions to which it was owed. Specifically, plaintiff claimed that Authorized Products "manufactured by Lawson Mardon USA Inc. / [APF&T] are to be included in the sales upon which commissions are due, regardless of the manufacturing site." (*Id.*)

Beginning in or around June 2004, APF&T stopped responding to a number of requests from Winter-Wolff for price quotes from Authorized Customers. (56.1 Stmnt. ¶ 88.) However, Winter-Wolff continued to receive monthly commission checks for some time before they

abruptly stopped. (56.1 Stmnt. ¶ 92.) The parties, however, dispute when the last check was actually issued. Plaintiff alleges it stopped receiving payments in June of 2005, while defendant contends that the payments continued through September 2005.[6] (56.1 Stmnt. ¶ 94.)

By letter dated May 5, 2005, plaintiff informed defendant that since July 19, 2004, APF&T had been in breach of the Contract by failing to pay all of the commissions due under the agreement, and that it had breached the covenant of good faith and fair dealing by failing to respond to the numerous requests for price quotes that plaintiff had submitted. (D's Ex. 25.) The letter also referred to two prior "requests to cure" sent by Winter-Wolff to APF&T, which were allegedly ignored. The letter stated that if defendant fails to cure these breaches by May 12, 2005, plaintiff would deem the contract terminated.[7] (*Id.*) In January 2006, Winter-Wolff began representing Floeter Flexible Packaging Group, a competitor to APF&T. (56.1 Stmnt. ¶ 20.)

## IV.     Commission Payments and Plaintiff's Claims

The parties have stipulated that APF&T paid Winter-Wolff a total of $256,392.85 in commissions between January 1, 2003 and December 31, 2006. (56.1 Stmnt. ¶ 24.) Defendant claims that the payment of this amount satisfies all of its obligations under the Contract, as it equals five percent of $5,127,849, the total net sales of all Authorized Products sold to Authorized Customers in the Authorized Territory during the relevant time period.

Winter-Wolff, however, claims that this sales total does not account for all of the sales for which it is due commissions under the Agreement, and brings this case for unpaid

---

[6] In April 2007, defendant remitted payment to Winter-Wolff for what it claims is the total commissions owed between September 2005 and December 31, 2006.

[7] Under section 6(b)(iii) of the Agreement, Winter-Wolff is permitted to terminate the Contract where defendant breaches any of its provisions and fails to cure within seven days' notice of such breach.

commissions under four causes of action. First, plaintiff claims that APF&T breached the terms of the Agreement by only paying commissions on products produced at the APF&T Shelbyville plant, and not products made at PPPI's Neenah plant. Second, plaintiff claims that APF&T's July 14, 2004 letter purporting to terminate the contract, and directing Winter-Wolff to refrain from contacting the Authorized Customers constituted an anticipatory breach. Third, that APF&T breached the covenant of good faith and fair dealing by failing to respond to Winter-Wolff's repeated requests for price quotes (SAC ¶ 93), by refusing to "provide Authorized Products to the Authorized Customers solicited by Winter-Wolff," (SAC ¶ 94), and by informing "Authorized Customers that Winter-Wolff was no longer authorized to sell to Authorized Customers or otherwise act as a sales representative for defendant," (SAC ¶ 96). Plaintiff's fourth and final claim alleges that defendant violated the Illinois Sales Representative Act, 820 ILCS 120/1(4), by allegedly failing to pay timely commissions. (SAC ¶¶ 100-06.) Plaintiff seeks treble statutory damages under this statute for what it claims was willful and bad faith conduct. (SAC ¶¶ 107, 109.)

## DISCUSSION

### I. STANDARD OF REVIEW

Summary judgment should be granted where the pleadings and admissible evidence offered to the Court demonstrate "no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56; *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). An issue of fact is genuine if the "evidence is such that a reasonable jury could return a judgment for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Roe v. City of Waterbury*, 542 F.3d

31, 35 (2d Cir. 2008).  Further, the relevant governing law determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.  Accordingly, where the undisputed facts demonstrate the union of all the required elements of a cause of action and no reasonable juror could find otherwise, the plaintiff is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existent of an element essential to that party's case.").

A party may defeat a motion for summary judgment only "by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of [an] element at trial." *Roe*, 542 F.3d at 36 (quoting *Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97, 100 (2d Cir. 1998)).  The non-movant must advance "more than a scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Affidavits submitted in opposition to summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show that the affiant is "competent to testify to the matters stated therein." *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (citing FED.R.CIV.P. 56(e)).[8]  Conclusory statements in affidavits or allegations in the pleadings are therefore insufficient to defeat a motion for summary judgment. *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996).

---

[8] The cited portion of FED.R.CIV.P. 56(e) was renumbered as Rule 56(c)(4) as part of the amendments to Rule 56 effective December 1, 2010.

## II. PLAINTIFF'S FIRST CLAIM: COMMISSIONS ON SALES OF PRODUCTS PRODUCED BY PPPI

As a matter of clarification, whether Winter-Wolff is entitled to commissions for Authorized Products that were merely sold by PPPI is, alone, not at issue. As discussed above, section 2(d) of the Contract explicitly accounts for the payment of commissions on sales of Authorized Products to Winter-Wolff, whether the sale was secured by APF&T or one of its affiliates. Neither party disputes this. At issue is whether Winter-Wolff is entitled to commissions on the sales of products produced by PPPI at its Neenah plant, regardless of which company originally cultivated and secured the sale.

### a. The Parties' Contentions

#### i. Defendant

Defendant argues that plaintiff's first breach of contract claim should be dismissed because Winter-Wolff is simply not entitled to commissions on sales of products manufactured by PPPI under the Agreement. (D's Memo at 7.) APF&T asserts that the Contract only provides for commissions for the sale of Authorized Products, which are defined as "Lawson Mardon flexible lamination food packaging products for retort applications." (*Id.* (citing Agreement §2(b)).) Therefore, defendant contends, "only flexible retort packaging products *manufactured* by [APF&T], the successor to [Lawson Mardon], are included in the definition of Authorized Products." (*Id.*) Because the Agreement did not provide for commissions on products made by APF&T's affiliates, plaintiff's attempt to obtain payment on those commissions "is nothing more than an improper attempt to gain a windfall by binding a non-party to the Agreement." (D's Reply/Opp. at 2.)

Defendant argues that Winter-Wolff could not have had any expectation that it would be

entitled to commissions on the sale of products made by APF&T's affiliates, particularly in the case of PPPI, which was not an affiliate of APF&T at the time the Contract was executed. (D's Reply/Opp. at 8, 11.)

APF&T further argues that under the Agreement, the amount of commissions due is based on the "net amount received by [Lawson Mardon]," and that commission payments were due "within 30 days of [Lawson Mardon's] receipt of the net amount subject to commission." (*Id.* (citing Agreement §4).) Accordingly, defendant claims that plaintiff cannot collect commissions on sales for which APF&T did not receive sales revenue, and that APF&T did not receive revenue from products manufactured by PPPI.

APF&T adds that plaintiff's citation to section 2(d) of the Agreement does not help its cause. Section 2(d) preserves Winter-Wolff's right to collect commissions on Authorized Products sold or marketed by one of APF&T's affiliates. (Agreement §2(d).) Defendant argues that plaintiff's reliance on this provision inappropriately broadens its plain meaning to encompass products *manufactured* by APF&T affiliates, rather than products merely sold by them. (D's Memo at 10.) All sales of Authorized Products during the Contract period, defendant contents, whether *sold* by APF&T or any of its affiliates such as PPPI, were paid. (D's Reply/Opp. at 12.)

### ii. *Plaintiff*

Winter-Wolff argues primarily that it does not matter which company actually made a given product because PPPI was acting as APF&T's agent for the sale *and* manufacture of the product, and that under this agency relationship the distinction between the two affiliates "disappears." (P's Memo at 20.) Plaintiff contends that "APF&T and PPPI worked hand in hand as [a] single business unit for the manufacture of flexible retort products," and that "APF&T's

products and personnel were meant to be indistinguishable from PPPI's." (*Id.*)

Plaintiff also argues that the Contract refers directly to "Alcan Packaging Food Flexibles North America," the parent corporation's business unit into which APF&T and PPPI were both integrated.[9] (*Id.* at 22.) Winter-Wolff argues that this reference reflects the intention to pay commissions for products made by all corporate affiliates under that umbrella. (P's Memo at 22.) Plaintiff adds that that the integrated business unit marketed all of its products under the "Alcan Packaging" trade name – the same trade name that plaintiff was purportedly hired to promote. (*Id.*)

Plaintiff takes specific issue with defendant's focus on the fact that the plants remained owned by each company separately. Plaintiff argues that the decision which factory to use was not based on who owned the plant, but on which plant had the best capacity to serve a client's particular need. (P's Reply at 3.) The fact that APF&T, for example, suspended its efforts to upgrade its Shelbyville plant to produce MREs because they could already be produced by PPPI at Neenah "alone establishes that APF&T used PPPI's plant as if it were its own." (*Id.* at 3.)

From Winter-Wolff's perspective, it was contracted to court large corporate customers such as "Hormel" and "Wornick," who were previously customers of PPPI. They bargained for the "exclusive right" to earn commissions from these customers, and negotiated for a contract that prohibited the removal of these customers from the Authorized Customers list. After the acquisition, however, "APF&T decided that it no longer wanted [Winter-Wolff] to sell to these customers and refused to supply [Winter-Wolff] with product to sell." (P's Memo at 24.) For plaintiff, APF&T took the promised opportunity to make "millions" from these Authorized

---

[9] The Contract provision containing that reference requires Winter-Wolff to report "internally in the Alcan Packaging organization to the Vice President Sales – Food Flexible, North America." (Agreement § 1.)

Customers for itself, "and didn't pay [Winter-Wolff] a penny." (*Id.*)


### b. Breach of Contract Analysis

As set forth in the Court's prior Memorandum and Order, the breach of contract claims in this case are evaluated under Illinois law. (*See* Memorandum & Order dated 7/18/08 at 6, docket no. 77.)   In Illinois, "the elements for a breach of contract claim are (1) the existence of a valid and enforceable contract, (2) plaintiff's performance of the contract, (3) defendant's breach of the contract and (4) resulting injury to the plaintiff." *Fabrica de Tejidos Imperial, S.A. v. Brandon Apparel Group, Inc.*, 218 F. Supp. 2d 974, 977 (N.D. Ill. 2002).

As noted above, Winter-Wolff is entitled to all commissions on sales during the Contract period for Authorized Products sold to Authorized Customers in the Authorized Territory.  What constitutes an Authorized Customer or the Authorized Territory is not at issue or in dispute. Rather, plaintiff's claim turns on the definition in the Agreement of an "Authorized Product." The Contract defines that term as "Lawson Mardon flexible lamination food packaging products for retort applications." (Agreement §2(b) and Attachment B thereto.)  All of the products implicated here are retort packaging products. The relevant question therefore is what constitutes a "Lawson Mardon" product under the Agreement.

Defendant naturally vies for a narrow definition that limits the scope to products "manufactured" by APF&T.  Winter-Wolff, of course, seeks a much broader interpretation of Authorized Products that would encompass items made by any corporate entity within the parent company's "Food Flexible North America" business unit.  In support, plaintiff cites to the opening paragraph of the Agreement which requires Winter-Wolff to "report internally in the Alcan Packaging organization to the Vice President Sales – Food Flexible, North America."

(Agreement § 1.)  Winter-Wolff argues that this reference "reflects the parties' intention that Mr. Weil receive commissions on sales to Authorized Customers of Authorized Products manufactured by Alcan Food Flexibles." (P's Memo at 22.)

Though the Agreement may require plaintiff to "report" within the larger business unit that later included both APF&T and PPPI, plaintiff's suggestion that this provision translates into such a definition of Authorized Products is belied by the basic language and elements of the Agreement itself.  First and foremost, the agreed-upon definition defines the relevant products as "Lawson Mardon" products, not "Food Flexible North America" products.  Secondly, plaintiff's citation to its reporting requirement in paragraph one of the Agreement in many ways undermines its argument.  The reference to "Food Flexible North America" and the "Alcan Packaging organization" demonstrates that the parties were aware of the distinction between Lawson Mardon and its parent corporation when the Contract was drafted, but nevertheless chose to refer specifically to Lawson Mardon in key provisions in the Contract.  The most important reference, of course, being located in the definition of Authorized Products, which is limited to "Lawson Mardon," not the umbrella units of its parent company or its affiliates.  As defendant points out, references to Lawson Mardon can also be found in provisions which base the amount of commissions due on the "net amount received by LM," and which require commission payments to be made "within 30 days LM's receipt of the net amount subject to commission." (*Id.* (citing Agreement §4).)

Plaintiff nevertheless argues that the definition of Lawson Mardon products was broadened as APF&T/Lawson Mardon products became, "Alcan Packaging" products when PPPI was acquired.  In other words, because products were sold to customers as "Alcan Packaging" products not APF&T or PPPI products specifically, plaintiff urges the Court to adopt

the view that Lawson Mardon products encompass all Alcan Packaging products under the Contract.

However, while the marketing end of the enterprise may not have distinguished between APF&T/Lawson Mardon products and PPPI products after the acquisition, a clearly delineated difference between the two nevertheless remained, *viz*, APF&T/Lawson Mardon still made its own products in its production facility in Shelbyville, and PPPI did so at its plant in Neenah. Furthermore, the Contract at issue is a "Manufacturer's Representative Agreement," which identifies defendant in the first paragraph as a "*manufacturer* of food packaging materials." (Agreement ¶ 1 (emphasis added).) To recognize a definition of Authorized Products that goes beyond items actually manufactured by APF&T itself, would ignore the most plain reading of the Contract's language. Moreover, where the parties intended the Contract to refer to the activities of APF&T's affiliates, such intent was written into the Agreement, as seen in the provision allowing for commissions where an affiliate *sells* the product. The Court therefore finds the definition of "Authorized Products" to be unambiguous, and that no reasonable interpretation would lend itself to the conclusion that it encompasses products manufactured by an affiliate corporation.

Finally, as noted above, the Agreement explicitly limits commissions to five percent of the "net amount received by [Lawson Mardon]." (Agreement §4) The evidence shows that the company whose factory produced the product receives payment from the customer – not the other affiliate and not the parent company. In fact, at deposition, Mosesian testified that even in the case where one customer—in this instance, Wornick—had a portion of its orders produced by PPPI at Neenah, and a portion produced by APF&T at Shelbyville, the customer would make separate payments to each company based on which factory produced a particular product.

16

(Mosesian Dep. 57.)   An email from a Daniel Jones, a PPPI employee in accounts receivable, directed Wornick to mail separate overnight checks to the two companies' respective banks. (D's Ex. 16.)  Mosesian stated that separate payments would be made because APF&T and PPPI "are two separate companies," and that the decision about which company received payment "would be based on which plant manufactured and sold the product." (Mosesian Dep. 57.)

Plaintiff argues that this evidence does not support the broader proposition ventured by defendant that APF&T "did not receive revenue from sales of flexible lamination food packaging products for retort applications manufactured at PPPI plants." (56.1 Stmnt. ¶ 15.) Plaintiff further suggests that such a proposition is "controverted" by an email from Weil to Larson that plaintiff claims is evidence that "APF&T sold or intended to sell flexible lamination food packaging products for retort applications manufactured at PPPI's Neenah plant." (*Id.*)  To the extent that the email, which merely seeks permission to send the customer test samples, actually suggests what plaintiff argues it does, the email does not "controvert" the suggestion that APF&T never received revenue for sales produced by PPPI.  In fact, the invoices of sales furnished by plaintiff reflect that APF&T received direct payment from customers whose orders were produced at Shelbyville. (P's Ex. 11.)  While this is not necessarily evidence that APF&T would never receive revenue for products made at Neenah, it is nevertheless evidence that the two affiliated companies maintained separate revenue streams.  More to the point, it is plaintiff's burden to demonstrate that it is entitled to commissions under the Agreement for goods produced by PPPI. The evidence shows instances where PPPI received revenue for items produced at Neenah, and zero instances where APF&T received the revenue for such production runs.  Having failed to proffer such evidence, it has failed to establish a genuine dispute regarding this material fact.

In sum, given the evidence currently before the Court, no reasonable jury could conclude

that the language of the Contract entitles plaintiff to commissions on the sales of products produced by PPPI in its Neenah plant.

### c. Plaintiff's Agency Theory

As an initial matter, the parties stipulated in a prior motion, and the Court agreed, that issues regarding agency in this case are governed by Delaware law. (*See* Memorandum & Order dated 7/18/08, docket no. 77 at 6.) It should also be noted that the Court denied plaintiff's prior motion to add PPPI as a defendant liable under the Contract under pure agency and alter ego theories of liability. Therein, the Court held, *inter alia*, that the "allegations that [APF&T] and PPPI shares a sales force, physical office, management and secretarial staff, while consistent with a close relationship, do not by themselves justify a finding of an alter ego relationship." (*Id.* at 11.) The motion to amend to allege liability under an alter ego or piercing the corporate veil theory was therefore denied as futile. (*Id.* at 14.)

To clarify, whether or not PPPI acted as APF&T's agent for the *sale* of any product, is not at issue.[10] At issue is whether PPPI served as an agent for the *manufacture* of such products, thereby entitling plaintiff to commissions on the sales of products produced by PPPI. The parties do not dispute that plaintiff is entitled to commissions for the sale of products made by APF&T in Shelbyville. Rather, the dispute involves plaintiff's entitlement to commissions on sales for products produced by PPPI in Neenah.

Under Delaware law, "[a]gency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and

---

[10] See discussions and citations *supra* confirming plaintiff's entitlement under the Contract to receive commissions on Authorized Products *sold* by an affiliate.

subject to his control, and consent by the other to so act." *Lang v. Morant*, 867 A.2d 182, 186 n.14 (Del. 2005)(citing Restatement (Second) of Agency § 1(1)); *Cox v. Dean*, 1994 Del. Super. LEXIS 357, *9 (Del. Super. Ct. July 29, 1994). "The 'touchstone' of the agency relationship is the principal's right to control the agent." *Jack Eckerd Corp. v. Dart Group Corp.*, 621 F. Supp. 725, 732 (D. Del. 1985)(citing *Government of Virgin Islands v. Richards*, 618 F.2d 242, 244 (3d Cir. 1980)); *see also* Restatement (Second) of Agency § 14("If the existence of an agency relation is not otherwise clearly shown . . . the fact that it is understood that the person acting is not to be subject to the control of the other as to the manner of performance determines that the relation is not that of agency."). "A second element is that an agent is a fiduciary who works on behalf of the principal and primarily for his benefit." *Jack Eckerd*, 621 F. Supp. at 731; *see also Cox*, 1994 Del. Super. LEXIS at *10 (citing Restatement (Second) of Agency § 13, cmt. a. and c.); *see* Restatement (Second) of Agency § 13, cmt. b. ("[T]he understanding that one is to act primarily for the benefit of another is often the determinative feature in distinguishing the agency relation from other relations."). Finally, an agent holds the power to "affect the legal relations of the principal in matters connected with the agency power to alter the legal relations between the principal and third persons and between the principal and himself." Restatement (Second) of Agency § 12.

Plaintiff argues that the evidence that PPPI acted as APF&T's agent for the sale and manufacture of retort products is "overwhelming." (P's Opp. at 20.) First, plaintiff notes, all of the deposition witnesses testified that the two companies' "products and personnel were meant to be indistinguishable," (*id.*); they integrated "sales, marketing and manufacturing under the Alcan Packaging Food Flexibles North America business unit, (*id.* at 21); Stacey directed Winter-Wolff to get its price quotes from a PPPI employee; and Stacey "instructed Dan Weil to sell retort

products produced at the PPPI plant to Menu," (*id.*).

The analysis of these claims begins with an examination whether APF&T, as a principal, exercised control over PPPI during the manufacturing process. The facts outlined in plaintiff's arguments above supports the view that the companies integrated their sales and marketing functions. Other evidence reflects shared duties in the pre-manufacturing stages of production as well. The parties, for example, do not dispute that Larson, a PPPI employee, "provided pricing for [both] the Neenah and Shelbyville plants," and that "in 2004 and 2005, certain Shelbyville R&D projects were managed by the Neenah Technical Center." (56.1 Stmnt. ¶ 62.) Further, the parties also do not dispute that the decision which plant will ultimately produce a product is largely technical, made by "technicians, the head of manufacturing, or a master production schedule[r], not the salesman." (56.1 Stmnt. ¶ 64.) These individuals would base their decision on "which plant had the best production equipment to meet customer need[s], which plant had experience in producing the product, which plant had available capacity, and which plant was qualified to produce the product." (*Id.*)

The record, however, does not specify which company these individuals worked for, though deposition testimony indicates that such a decision could have been made "technical people in the Neenah Technical Center." Larson testified at her deposition that the final decision would be made by Paul Seminak, the director of capacity planning, but did she did not indicate whether he is employed by APF&T or PPPI. (Larson Dep. 173.) Larson, a PPPI employee herself, stated that she had some "input" into the matter. (*Id.*)

None of the evidence, however, suggests that APF&T had any meaningful input for purposes of establishing agency, or otherwise exercised any control over PPPI regarding the decision to produce products at the Neenah plant or regarding the actual production at that plant.

Plaintiff may nevertheless argue that the manufacturing process was controlled by Alcan Food Packaging, the parent company's business unit that encompassed both APF&T and PPPI. But there is no evidence that APF&T possessed any authority to influence or control PPPI through this joint business unit. Deposition testimony shows that Stacey, Vice President of Sales for APF&T, supervised the business unit's entire joint sales staff, but as the parties have stipulated, the manufacturing decisions were not made by sales employees.

Plaintiff also argues that the two companies "worked hand in hand as a single business unit for the manufacture of flexible retort product," (P's Opp. at 20), and that by doing so the parent company "erased any distinction between APF&T and PPPI by integrating their sales, marketing, and manufacturing under the Alcan Packaging Food Flexibles North America business unit," (*id.* at 21). In support, plaintiff cites to a Delaware case which stated that "Delaware courts have found that an agency relationship may exist between corporate affiliates with close business ties." *Wesley-Jessen Corp. v. Pilkington Visioncare, Inc.*, 863 F. Supp. 186, 188 (D. Del. 1993). In *Wesley-Jessen*, the two companies at issue were wholly owned subsidiaries of the same corporation that operated "in lockstep" as part of a single business group, and which presented "themselves as a unified entity to their employees and to the marketplace." *Id.* The court thereafter concluded that one subsidiary was the agent of the other. *Id.* at 189. However, the *Wesley-Jessen* court considered the issue of agency in an entirely different context than what is present in the instant case. There, the court decided whether one entity was the agent of the other within the meaning of Delaware's Long-Arm Statute. The court specifically held that the element of "control" is not dispositive to the question of agency within the context of personal jurisdiction. Rather, Delaware's long-arm statute "is to be broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause."

*Id.* (citing *Hercules Inc. v. Leu Trust and Banking*, 611 A.2d 476, 480 (Del. 1992)).  Therefore when determining personal jurisdiction, "the word 'agent' is not constricted" to a definition that requires the element of control.  *Id.*

We look at the question of agency here not in the context of personal jurisdiction, but in the context of the principal's contractual liability for the acts of its agent.  Such liability necessarily requires plaintiff to demonstrate that APF&T possessed control over PPPI in the manufacture of products at its Neenah plant.  Notwithstanding the evidence that certain sales and marketing were integrated, this vital showing of "control" is missing from the record.

Clearly, some level of oversight regarding the companies' manufacturing practices was exercised by Alcan Inc.'s retort packaging business unit, but the contract at issue here is with APF&T, not the parent company, nor is the parent company a defendant in this action.

The record is similarly devoid of evidence of the second agency element, *viz*, that PPPI acted for the benefit of APF&T in manufacturing retort products at their Neenah facility.  As discussed in detail above, when an order was produced by PPPI at Neenah, payment was made directly and exclusively to PPPI.  APF&T received nothing.  PPPI therefore retained the full pecuniary benefit of the sale, and therefore could not have been acting as APF&T's agent during the manufacturing process.

Having failed to proffer evidence to support the first two elements set forth above, plaintiff has not made out a claim under the agency theory.  Accordingly, defendant's motion for summary judgment on plaintiff's first breach of contract claim is granted, and plaintiff's motion for judgment on the same claim is denied.

## III. PLAINTIFF'S SECOND CLAIM: ANTICIPATORY BREACH

Plaintiff's second claim for relief alleges that defendant's July 19, 2004 letter, which purported to terminate the Agreement effective July 19, 2005 constituted anticipatory breach. (SAC ¶¶ 78-91.) Under Illinois law, "anticipatory breach, also called anticipatory repudiation, is a manifestation by one party to a contract of an intent not to perform its contractual duty when the time comes for it to do so even if the other party has rendered full and complete performance." *Tower Investors, LLC v. 111 E. Chestnut Consultants, Inc.*, 371 Ill. App. 3d 1019, 1031 (Ill. App. Ct. 1st Dist. 2007)(citing *In re Marriage of Olsen*, 124 Ill. 2d 19, 24, 528 N.E.2d 684, 686, (1988)). The breaching party's repudiation must be "a definite and unequivocal manifestation that he will not render the promised performance." *Olsen*, 124 Ill. 2d at 24. Upon notice of an anticipatory repudiation, the non-breaching party is presented with three options: "(1) rescind the contract and seek quasi-contractual relief; (2) attempt to keep the contract in force by awaiting time for the promisor's performance and then bringing suit; or (3) elect to treat the repudiation as a breach putting an end to the contract for all purposes of performance." *Oil Express Nat'l v. D'Allesandro*, 1998 U.S. Dist. LEXIS 9437, *7-*8 (N.D. Ill. June 15, 1998)(citing *Builder's Concrete Co. of Morton v. Fred Faubel & Sons, Inc.*, 58 Ill. App. 3d 100, 104, 373 N.E.2d 863, 867-68 (Ill.App. 3 Dist. 1978)).

There can be little doubt that APF&T's July 19, 2004 letter, which states that the "Agreement will terminate on July 19, 2005," (D's Ex. 15), expressed a "clear manifestation" of its intent to terminate the contract before the end of the specified contract period, *see Olsen*, 124 Ill. 2d at 24. What is equally clear is that plaintiff's response less than a month later rejected this notice by declaring that "Winter-Wolff intends to continue to discharge its duties and responsibilities throughout the full term of the [Agreement], and anticipates that [APF&T] will

23

similarly honor its commitments as set forth in the Agreement." (P's Ex. 16 at 2.) By doing so, plaintiff opted for the second option listed above, *i.e.*, Winter-Wolff insisted that the Contract remain in full force and effect.

However, before APF&T's declared date of termination on July19, 2005, Winter-Wolff changed course by sending APF&T a second letter, dated May 5, 2005, stating that the Contract would be terminated for cause within seven days. (D's Ex. 25.) This notice claimed authority to declare termination of the Contract pursuant to section 6(b), which is entitled "Termination by REPRESENTATIVE[11] for cause." Under section 6(b)(iii), where defendant breaches any provision of the Contract, Winter-Wolff may terminate the Contract if defendant fails to cure within seven days' notice of such breach. The breaches alleged in the letter included: (1) "the failure to pay commissions to Winter-Wolff on all sales of Authorized Products to Authorized Customers in the Authorized Territory," and within thirty days; (2) "breaches of the implied covenant of good faith and fair dealing by failing to respond to Winter-Wolff's requests for price quotes"; (3) "failure to accept orders for Authorized Products"; and (4) "interference with Winter Wolff's ability to market the Authorized Products to listed customers." (D's Ex. 25.)

Notably, the Contract provides that such termination for cause does not extinguish "any other remedy to which [Winter-Wolff] may be entitled at law, in equity or otherwise under this Agreement." (Agreement §6(b).) The Agreement further entitles the terminator to commissions on all "orders and contracts accepted by LM prior to the effective date of such termination." (*Id.* §6(d).) Therefore, once plaintiff effectuated its right to termination for cause, the contractual relationship ended and its claims for commissions under the Agreement were limited under paragraph six to those orders accepted by defendant prior to May 12, 2005. Although plaintiff

---

[11] The language of the Contract refers to Winter-Wolff as the "Representative."

continued to receive payments for commissions on sales through December 31, 2006, there is no evidence that plaintiff ever retracted its notice of termination. In fact, plaintiff approached Floeter—a competitor to Alcan—at some point in mid-2005 to discuss serving as their sales representative.[12] (Weil Dep. 11.) As such a relationship with a competitor would have been prohibited by the terms of the Contract (*see* Agreement § 7(c)), plaintiff's conduct in this regard suggests the notice of termination remained in effect.

The Court need not evaluate the merits of plaintiff's claims for breach contained in its letter of notice to determine if the termination was contractually valid. Even if plaintiff's claims of breach in the May 5, 2005 letter were invalid, and the invocation of section 6(b) of the Contract a nullity, Winter-Wolff nevertheless expressed an unequivocal intention to terminate the Contract. In other words, if the letter was not in fact a valid termination pursuant to section 6(b), it would have constituted plaintiff's acceptance of defendant's prior notice of repudiation. Plaintiff's May 5, 2005 letter states that defendant had been in breach of the Contract since July 19, 2004, the date of defendant's letter of repudiation, and a direct reference to the notice of repudiation contained therein. (Ds' Ex. 25.) An election to treat repudiation as a breach (option three above) puts an end to the contract for all purposes of performance. *Builder's Concrete*, 58 Ill. App. 3d at 104. This effect is not altered by the fact that plaintiff initially chose to reject the repudiation in its August 18, 2004 letter. *See id.* at 105 ("It is not an irrevocable election not to treat the renunciation as a breach.")(quoting *Bu-Vi-Bar Petroleum Corp.v. Krow*, 40 F.2d 488, 492 (10th Cir. 1930)); *see also* Restatement of Contracts § 320, comment a ("An anticipatory repudiation continues in effect until affirmatively retracted by the repudiator."). Therefore,

---

[12] Plaintiff later signed a representative sales contract with Floeter, effective January 2006. (56.1 Stmnt. ¶ 20.)

whether the May 5, 2006 notice of termination was a valid invocation of the Contract's

termination clause, or an acceptance of defendant's prior notice of repudiation, the result is the

same: the Contract, and the concomitant obligations of the parties, ended on May 12, 2005.

Nevertheless, during the period of time prior to the May 12, 2005 Contract termination,

plaintiff chose to reject defendant's repudiation and keep the Contract in effect.  Therefore,

plaintiff's claim for anticipatory breach and its claim for actual breach are, in essence, the same.

*See D'Allesandro*, 1998 U.S. Dist. LEXIS 9437 at 7-8.  As the Court has disposed of plaintiff's

general claim for breach *supra* at pages 14-18, it likewise dismisses plaintiff's claim for

anticipatory breach prior to May 12, 2005.  Nevertheless, in the discussion below, the Court will

address plaintiff's remaining causes of action mindful of the effect of plaintiff's notice of

termination on any claims for damages arising after May 12, 2005.


**IV.	PLAINTIFF'S THIRD CLAIM: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

Plaintiff makes three factual allegations underlying its claim for breach of the implied

covenant of good faith and fair dealing.  First, defendant refused to respond to its requests for

price quotes for potential customers; second, defendant purposefully delayed its upgrade of the

Shelbyville plant and transferred the work that would otherwise be produced in Shelbyville to

Neenah; and third, defendant "channel[ed] sales and manufacturing of retort for Authorized

Customers from APF&T to PPPI."

Although plaintiff alleges this claim as a separate breach, under Illinois law, the covenant

of good faith and fair dealing "is a rule of construction, not a stand-alone obligation." *In re*

*Kmart Corp.*, 434 F.3d 536, 542 (7th Cir. 2006); *see also Zeidler v. A & W Rests., Inc.*, 301 F.3d

572, 575 (7th Cir. 2002) ("The covenant is only an aid to interpretation, not a source of contractual duties or liability under Illinois law.").  "'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties. When the contract is silent, principles of good faith-such as the UCC's standard of honesty in fact . . . fill the gap." *Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Products*, 212 F. 3d 373, 382 (7th Cir. 2000) (quoting *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990)).  The covenant "ensures that parties do not try to take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or to do anything that will destroy the other party's right to receive the benefit of the contract." *Voyles v. Sandia Mortg. Corp.*, 196 Ill. 2d 288, 296, 751 N.E.2d 1126 (2001)(citing *Cramer v. Insurance Exchange Agency*, 174 Ill. 2d 513, 525, 675 N.E.2d 897 (1996)).

### a.  Price Quotes

Plaintiff first argues that plaintiff violated the covenant of good faith and fair dealing by failing to respond Winter-Wolff's requests for price quotes for potential customers.  As mentioned, the Agreement expressly prohibits Winter-Wolff from offering prices to customers that have not been authorized by APF&T personnel, and invalidates customer orders for which the price has not been duly authorized. (Agreement ¶2(g).)  It is therefore reasonable to read into the Contract a corresponding "good faith" obligation on defendant's part not to ignore Winter-Wolff's requests for price quotes.  As the Court noted in its prior decision in this case, "[t]he contract does not specify that defendant's personnel must respond to requests for price quotes but

surely such an obligation would be implied given that only written prices by defendant's personnel can be presented to customers." *Winter-Wolff Int'l, Inc. v. Alcan Packaging Food & Tobacco, Inc.*, 499 F. Supp. 2d 233, 239 (E.D.N.Y. 2007). The parties do not dispute that "following a meeting in June 2004, Winter-Wolff submitted multiple requests for price quotes to which [APF&T] did not respond." (56.1 Stmnt. ¶ 85.)

As evidence of those requests, plaintiff proffers a series of emails which began in the summer of 2004. The first set of emails date from late June to early July 2004, and were exchanged between Stacey and Weil. (P's Ex. 16.) This correspondence demonstrates that Winter-Wolff made a number of price-quote requests—"primarily" to Erin Larson—on behalf of Berner Foods that went unanswered. (P's Ex. 16.) Weil later followed up with an email to Larson on August 6, 2004, deriding her for a "lack of responsiveness" and attaching a separate email correspondence from an employee at Berner Foods expressing their impatience. (*Id.*) A subsequent email from Weil to Stacey indicates that the price-quote request from July had still gone unanswered in October, and that no other sales representative from either APF&T or PPPI had otherwise contacted Berner Foods on defendant's behalf. (*Id.*)

These emails clearly demonstrate defendant's repeated failure to respond to price-quote requests from plaintiff regarding Berner Foods, and defendant does not dispute the fact that these requests were made. The viability of this particular claim therefore comes down to a matter of damages. Notwithstanding defendant's failure to respond to these price-quote requests, plaintiff does not dispute that Berner Foods did otherwise conduct business with APF&T in 2005 in the amount of $57,081, or that it was paid $2,854.05 commissions on those sales. (*Id.*) This figure may have little or nothing to do with the requests that defendant repeatedly disregarded, and the Court will not put plaintiff in the position of having to disprove any such connection.

Nevertheless, plaintiff bears the burden of presenting evidence of damages as an element of any breach of contract claim. The only evidence before the Court pertaining to Berner Foods show sales in 2004 and 2005 with corresponding commission payments to Winter-Wolff. (*See* 56.1 Stmnt. ¶ 23.) There is no evidence, however, of the potential value of the lost business to Berner Foods arising from the disregarded quote requests. In fact, in contrast to the emails submitted by plaintiff relating to other customers, the Berner Foods emails do not indicate the type or quantity of the product for which a price quote was sought. Such information would at least provide the basis for an estimate of damages. Plaintiff's claim as it relates to Berner Foods therefore fails for lack of evidence tending to suggest that plaintiff sustained any damages traceable to defendant's failure to respond to price quote requests for Berner Foods. And, it will be recalled, "resulting injury to the plaintiff" is the final element of a breach of contract claim. *Supra* at 14 (citing *Fabrica*, 218 F. Supp. 2d. at 977).

Plaintiff also submits copies of email correspondence with Stacey regarding another customer, Menu Foods. (P's Ex. 15.) The particular email relating to Menu Foods, dated November 3, 2004, does not demonstrate that plaintiff ever made price-quote requests for Menu Foods. Rather, what the email shows is that Winter-Wolff, at APF&T's request, stopped making contact with representatives at that company so that APF&T and PPPI sales agents could handle sales for the account themselves. (*Id.*) The correspondence further indicates that six months after asking Winter-Wolff to step aside, APF&T failed to pick up the mantle and approach Menu Foods on its own. A telephone call to Weil from a representative at Menu Foods, referenced in the email, suggested that they were "continuing to look" for a supplier of certain retort packaging products. (*Id.*)

It is not entirely clear what claim this email is offered to support. In this instance, there is no evidence that either plaintiff or Menu Foods itself ever made a price-quote request. Presumably, plaintiff suggests that (1) defendant breached the Contract by asking Winter-Wolff not to contact this customer, and/or (2) that defendant breached some implied obligation to pursue this customer on its own.[13] Regardless, however, the claim as to Menu Foods fails for lack of evidence. The record demonstrates that defendant had previously "lost" Menu Foods's business at some point in early 2004,[14] if not earlier, prompting Weil and Larson to make a special trip in May of 2004 to Menu's offices in Canada to solicit their business. (Stacey Dep. 49; 11/3/04 Email, P's Ex. 15.) Therefore, according to unrefuted deposition testimony, APF&T lost the account before Winter-Wolff was allegedly told to stop contacting the customer. Plaintiff's evidence regarding Menu Foods, at best, lends to the speculative suggestion that had defendant's sales agents contacted this customer, it would have led to a return of business, notwithstanding that a face-to-face meeting in May failed to yield any such results. There is no evidence in the record tending to demonstrate the likelihood or magnitude of potential business with Menu Foods that plaintiff lost as a result of defendant's action or inaction. Plaintiff's claim pertaining to this customer is therefore dismissed.

Plaintiff appears to make a similar assertion regarding the Ameriqual account. There is no indication that Winter-Wolff made any price-quote requests on Ameriqual's behalf. Instead,

---

[13] Notably, the SAC also alleges that "APF&T informed Authorized Customers that Winter-Wolff was no longer authorized to sell to Authorized Customers or otherwise act as a sales representative for defendant." (SAC ¶ 96.) To the extent that plaintiff continues to assert this claim, there is no evidence in the record that defendant ever made the alleged communications with these customers. The claim is therefore dismissed.

[14] Prior to this reported loss, APF&T earned gross sales from Menu Foods of $670,767 and $1,985,534 in 2003 and 2004 respectively. (56.1 Stmnt. ¶ 23.) No business was conducted with Menu Foods in 2005. (*Id.*)

Weil's email message to Ameriqual on November 18, 2004 states that Winter-Wolff was not the one handling their business, and that the customer should contact Stacey directly to find out who the sales agent will be. (P's Ex. 15.) Subsequent emails from Weil to Jeff Heaslip demonstrate that Winter-Wolff understood that it was not to sell products to Ameriqual. (*Id.*) In contrast to the emails regarding Berner Foods and Menu Foods, where there was clear evidence of a protracted period of silence from defendant, the emails pertaining to Ameriqual cover only a week's time. (Emails dated 11/15/04-11/22/04, P's Ex. 15.) Other emails from the following January, regarding a different product inquiry, show that Stacey promptly addressed Ameriqual's request by forwarding the message to the appropriate sales people for follow up. (Email dated 1/29/05, P's Ex. 15.) Again, however, plaintiff's fail to offer any evidence that defendant's lack of response lasted more than a week, that Ameriqual's inquiries were likely to lead to actual business, or any indication what the potential business would be worth.

Therefore, plaintiff has failed to support its claim that defendant's conduct related to the requests for price quotes violated the covenant of good faith and fair dealing.

### b. Investment in the Shelbyville Plant

Plaintiff further argues that defendant had a good faith obligation under the Contract to develop its capacity to serve the market that Winter-Wolff was chosen to target under the Agreement. (P's Reply at 6.) Under paragraph 8(f) of the Agreement, plaintiff is required to "support and effect the transition of product manufacturing activities currently conducted by affiliates of LM in Switzerland and Germany to the United States [and] to use best efforts to assist LM's development of the retort market in the United States, including . . . converting customers from imported [retort products] when such conversions are implemented [and to] . . .

assist LM in qualifying such products with the customers."  (Agreement ¶ 8(f).) From this

Contract provision, plaintiff suggests that defendant possesses a "corresponding good faith

obligation to undertake the market development that was a necessary precondition for WW's

performance." (P's Reply at 6.)  Defendant purportedly failed to meet this obligation in that it

admittedly "stopped developing the market for products produced at its Shelbyville plant,

because it preferred to sell the same product from PPPI's Neenah plant." (*Id.* at 6.)  Plaintiff

contends that it could "never have expected that APF&T would breach the Contract by actively

assisting another entity to achieve the Contract's stated objective." (*Id.* at 7.)

The quoted excerpt from paragraph 8 of the Agreement specifies a bargained-for duty of

Winter-Wolff to help customers make the conversion from imported packaging materials to

domestically produced packaging materials made by APF&T. (Agreement ¶ 8(f).)  In essence,

not only will plaintiff bring in new customers, but it will also assist those customers in the

technical process of "qualifying" these products to the specifications of the production facility.

However, plaintiff's interpretation that this negotiated benefit to defendant imposes an analogous

obligation on APF&T is unsupported.

Factually, plaintiff overstates its case by suggesting that defendant admitted to stopping

the development of the market for products manufactured at Shelbyville "because it preferred to

sell the same product from PPPI's Neenah plant." (P's Reply at 7.)  Stacey did testify that shortly

after the acquisition, "a business decision was made. If Shelbyville couldn't manufacture the

product at that time, there was no point spending money, further money . . .  if the business was

already being produced within PPPI." (Stacey Dep. 133.)  However, this initial decision did not

have the degree of impact that plaintiff suggests.  In fact, APF&T continued to invest in the

Shelbyville plant and develop its capacity to produce certain products.   For example, Larson

testified that in the winter of 2005, Shelbyville had not yet been qualified to produce MREs. (Larson Dep. 83.) However, during the course of the Contract period, APF&T was "running trials for a long period of time" to get the facility approved for such items. (*Id.*) In fact, at times, as the Shelbyville plant was upgraded to produce a particular product, the manufacturing would be transferred to that facility, as was the case with the production of non-foil retort pouches for the "Bulldozer" project. (*See id.* 177-78.) Further, at some point in 2005, Shelbyville began producing flexible retort products. (Lozen Dep. 75.) Moreover, the sales staff continued to sell commissionable products to customers that were produced at both plants, (Larson Dep. 88-93, 96, 98), and no bonus incentive existed to encourage the sales staff to favor one plant over the other, (Lozen Dep. 157).

Plaintiff points to the year-to-year decline in sales from products made at Shelbyville as evidence of the impact of defendant's alleged failure to develop the market that plaintiff was contracted to enhance. According to plaintiff, "as APF&T stopped responding to WW's requests for quotes, and switched sales to Neenah, Shelbyville's 2005 retort sales fell by seven eighths." (P's Memo at 29.) While the evidence does show a dramatic decline in sales of APF&T products out of Shelbyville after the acquisition, there is no evidence that this decline was inversely proportional to PPPI/Neenah sales figures during the same period. In fact, there is no record of gross PPPI sales whatsoever. Without such, a jury would be unable to draw any relevant conclusions about the cited decline, as PPPI could very well have undergone a similar decline in sales during that same period.

The question here is whether there was an implied duty in the Contract to maintain a certain level of production at the Shelbyville plant. In the end, plaintiff does not dispute that it continued to receive commissions on products made at Shelbyville through the end of 2006,

despite changes to the relative production roles of the two plants. Rather, it takes issue with the level of investment in Shelbyville and its product line, and its impact on plaintiff's commissions. However, plaintiff has not made a sufficient showing that the Contract implies any such obligation regarding company business decisions, nor has it produced evidence that defendant's conduct in that regard caused a relative decline in commission payments.

### c. The Alleged "Channeling" of Business to PPPI

The final prong of plaintiff good faith and fair dealing claim is related in many was to the previous one. Therein, plaintiff alleges that defendant "channel[ed] sales and manufacturing of retort for Authorized Customers from APF&T to PPPI."

First, the only evidence regarding the process of selecting a manufacturing site reflects a highly technical decision, which primarily considered the production capacities of the two plants. No testimony has been offered to the contrary. Notably, as mentioned above, there was no incentive for the sales staff in particular to push one product over another based on where that product would likely be made. (*See* Lozen Dep. 157.) Additionally, as was established in the section above regarding plaintiff's agency theory, there is no evidence that defendant had any actual control over the decision on which factory would ultimately produce the product. Plaintiff has also not established that any order originally quoted for production at the Shelbyville plant was later slated for manufacture at the Neenah plant. Plaintiff has therefore failed to establish its claim that defendant violated the covenant and "channeled" the manufacture of certain products to PPPI's Neenah plant.

## V. PLAINTIFF'S FOURTH CLAIM: VIOLATION OF THE ILLINOIS SALES REPRESENTATIVE ACT

Plaintiff's final claim asserts that it is entitled to damages under the Illinois Sales Representative Act, 820 ILCS 120/3, for failing to pay timely commissions. Therein it is alleged that defendant stopped making regular commission payments as early as June of 2005. (56.1 Stmnt. ¶ 94.)

As has been established, plaintiff terminated the contract effective May 12, 2005. Under the parties' Agreement, plaintiff is entitled to commissions following termination "with respect to orders and contracts accepted by LM prior to the effective date of such termination." (Agreement § 6(d); *see also* §6(b).) "LM shall not be liable for commissions on orders submitted by REPRESENTATIVE after the effective date of termination, unless LM agrees in writing to such liability," (*Id.* §6(d)(ii)), and "[n]o commissions shall be due REPRESENTATIVE on specific releases or orders against annual purchase orders, blanket agreements and similar agreements received by LM after the effective date of termination," (*Id.* §6(d)(iii)).

Here, according to plaintiff's version of the facts, the last regular commission payment was made in June 2005 – after the effective date of its notice of termination. Nevertheless, plaintiff asserts that notwithstanding its notice of termination, it is due commissions on all sales through the end of 2006. Plaintiff goes even further with this argument by characterizing defendant's interpretation that post-termination commissions are not payable under the Contract as "border[ing] on bad faith." (P's Reply at 8.) Such a characterization is inappropriate. Limited exceptions aside, defendant's understanding of sections 6(b)(iii) and 6(d) dovetails with the text of the provisions. In urging a contrary conclusion, plaintiff limits its rationale to unpersuasively

suggesting that because defendant went ahead and paid commissions through December 2006, it is somehow estopped from making their present argument now. (*See* P's Reply at 8.)  No authority is provided for this argument, nor is the Court aware of any.  There is no indication in the record, for example, that plaintiff relied to its detriment on defendant's commission payments – quite the contrary.

To the extent that there are outstanding commissions on customer orders or other such transactions existing prior to plaintiff's termination date of May 12, 2005, no such commissions have been identified by plaintiff that have not been addressed by the Court *supra*.  Therefore, as plaintiff has failed to establish that it is entitled to commissions under the Contract that have not been paid, its claim for relief under the Illinois Sales Representative Act must therefore be dismissed.

**CONCLUSION**

For the above reasons, defendant's motion for summary judgment is granted and plaintiff's cross motion is denied.  Plaintiff's second amended complaint is hereby dismissed. The Clerk of Court is directed to close this case.

SO ORDERED.


Dated: Central Islip, N.Y.
      May 23, 2012                         _____/s_____
                                          Denis R. Hurley
                                        United States District Judge